Oliver D. Griffin (*pro hac vice* application forthcoming)
oliver.griffin@griffinlawllp.com
Melissa A. Bozeman (*pro hac vice* application forthcoming)
melissa.bozeman@griffinlawllp.com
**GRIFFIN PARTNERS LLP**
123 S. Broad Street, Suite 1850
Philadelphia, PA 19109
Telephone: (267) 313 – 0766
Facsimile: (267) 427 – 8139

Steven A. Heath (SBN 250867)
saheath@heathsteinbeck.com
**HEATH STEINBECK, LLP**
407 N. Maple Drive, Ground Floor
Beverly Hills, CA 90210
Tel: (213) 335-6245
Fax: (213) 335-6246

Attorneys for Plaintiff EMBLAZE ONE INC.,
a Nevada corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMBLAZE ONE INC., a Nevada corporation,<br><br>Plaintiff(s),<br><br>vs.<br><br>FRANK A. CRISTAUDO, an individual; VERONICA S. BAITOVA, an individual; CRISTAUDO HOLDINGS LLC, a New York limited liability company; DAPIT NA LLC, a Delaware limited liability company; MAXAFI HOLDINGS LLC, a New York limited liability company; VERONICA WEB PROJECT INC., a New York corporation; and DOES 1-20,<br><br>Defendant(s). | Case No. 2:25-cv-01813<br><br>**COMPLAINT FOR:**<br>  **(1) FRAUD;**<br>  **(2) CONSPIRACY TO DEFRAUD;**<br>  **(3) CIVIL RICO;**<br>  **(4) CONVERSION;**<br>  **(5) AIDING AND ABETTING;**<br>  **(6) BREACH OF CONTRACT; and**<br>  **(7) RESTITUTION**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

Plaintiff, Emblaze One Inc. ("Emblaze"), by and through its undersigned counsel, brings this complaint against Defendants Frank A. Cristaudo ("Frank"), Veronica S. Baitova ("Veronica"), Cristaudo Holdings LLC ("Cristaudo") (collectively, the "Cristaudo Defendants"), DapIt NA LLC, Maxafi Holdings LLC, Veronica Web Project Inc. (collectively, "Defendants"), who participated in a fraudulent scheme to steal millions of dollars from Emblaze, and alleges as follows:

## I.  INTRODUCTION

1.     This case arises from an elaborate fraud orchestrated by Frank Cristaudo, principal of Cristaudo Holdings LLC, and facilitated by his wife, Veronica Baitova. Through a series of misrepresentations, Defendants induced Emblaze, an e-commerce sales platform, to entrust  them with transaction processing services. Frank fraudulently presented Cristaudo as a legitimate Payment Service Provider ("PSP"), falsely claiming to have the requisite banking relationships and operational capabilities to lawfully process electronic transactions. Relying on these assurances, Emblaze entered into a Business Services Agreement (the "Agreement") with Cristaudo, believing it was contracting with a lawful and competent service provider.

2.     Defendants, however, had no intention of fulfilling their obligations. Instead of properly settling and distributing funds, Defendants systematically stole millions of dollars in transaction proceeds and funneled them into personal accounts. Although Emblaze was the only merchant listed in Cristaudo's accounting records, Emblaze had obligations to its own clients who relied on its platform for payments. When Cristaudo failed to remit funds, merchants immediately began demanding their money from Emblaze because they believed Emblaze was responsible for the missing settlements. This left Emblaze exposed to financial strain and reputational harm, forcing it to advance payments out of its own pocket to mitigate the fallout.

3.     Frank and Veronica went to great lengths to perpetuate their fraudulent scheme. They manipulated Emblaze's trust, evaded legitimate inquiries, and fabricated excuses to delay exposure, including blaming banks and other individuals while falsely

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

claiming that settlements were forthcoming. They intentionally stalled Emblaze by using fast-talking, deliberate miscommunications, and outright lies. As pressure mounted, Frank resorted to threats of physical violence, claiming he would break the legs of those truly responsible for the missing funds --- further confirming his blatant disregard for lawful conduct.

4. The fraud was uncovered when one of Frank's own business associates out of Mexico inadvertently disclosed that large sums of money had been diverted to an undisclosed cryptocurrency wallet controlled by Frank – completely separate from Emblaze's accounts. This confirmed the full extent of the misappropriation. Over $3.3 million vanished through Cristaudo, with Emblaze personally absorbing at least $1.5 million to cover client shortfalls.

5. As a direct result of Defendants' fraudulent actions, Emblaze has suffered significant financial and reputational harm. The company's credibility within the e-commerce and payment services industry has been severely damaged, with business partners questioning its ability to process transactions reliably. At industry events like ICE and Sigma, Emblaze was publicly shamed, with agents and merchants accusing it of failing to remit payments. These accusations – caused entirely by Cristaudo's theft – have prevented Emblaze from expanding its business as planned, compounding its financial losses inflicted by Defendants' fraudulent conduct.

## II. PARTIES

6. Plaintiff Emblaze One Inc. is a Nevada corporation with its principal place of business located at 9454 Wilshire Boulevard, Suite 300, Beverly Hills, California 90212. Emblaze provides its clients with a turnkey e-commerce sales and payments services platform. Emblaze's principal is Jaspreet Mathur ("Jas").

7. Jas engaged Frank A. Cristaudo's company to provide payment processing services. When problems arose, Jas initially attempted to resolve them privately with Frank. However, Frank's erratic behavior – disappearing for days at a time, returning in a euphoric state, then vanishing again – raised concerns. Jas later learned from others and

2

his own observations that Frank exhibited signs of a substance use disorder. At industry events, Frank was known to seek cocaine for himself and his spouse, Veronica S. Baitova. Additionally, Frank falsely claimed to be a billionaire and Jas's long-time business partner. Upon information and belief, Frank's substance abuse habit forced him into debt—both to illegal drug suppliers and to sustain his family's extravagant lifestyle in New York City and the Hamptons.

8.    Defendant Frank A. Cristaudo is an individual residing at 40 River Rd., Apt 12 K, New York, New York. As the principal of Defendant Cristaudo Holdings LLC, along with his wife Veronica S. Baitova, he masterminded the fraudulent scheme at issue in this case.

9.    Defendant Veronica S. Baitova resides at 40 River Rd., Apt 12 K, New York, New York. She actively participated in the misappropriation of funds, attended meetings, justified missing payments, and likely controlled accounts receiving stolen money. Veronica is a real estate agent employed by Brown Harris Stevens ("BHS"), holding New York license number 10401364837. According to BHS's website, she has a background in payments and fintech. Veronica is also known to work in New York as a "Madame," organizing parties involving sex workers and illegal substances.

10.    Defendant Cristaudo Holdings LLC is a New York limited liability company with its principal place of business at 750 Lexington Ave., New York, New York 10022. This entity was used as a fraudulent shell entity to facilitate the theft of funds.

11.    Defendant DapIt NA LLC is a Delaware limited liability company with experience in the payment industry with its principal place of business at 750 Lexington Ave., New York, New York 10022. Upon information and belief, it was used in the scheme to facilitate the theft of Emblaze's funds.

12.    Defendant Maxafi Holdings LLC is a New York limited liability company related to DapIt NA LLC. Upon information and belief, it was also used in the scheme to divert Emblaze's funds.

13.    Defendant Veronica Web Project Inc. is a New York corporation with its

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

principal place of business at 1230 Ave. Z, Ste. 5 K, Brooklyn, NY, United States, 11235. Upon information and belief, it was also used in the scheme to divert Emblaze's funds.

14.    "Does 1-20" are unknown at this time and may include, but are not limited to, individuals and companies facilitating or actively participating in the scheme to steal Emblaze's money.

### III.    JURISDICTION, VENUE, GOVERNING LAW

15.    This Court has original federal question subject matter jurisdiction under 28 U.S.C.§ 1331 because Emblaze has alleged a right to relief under 18 U.S.C. §§1961 *et seq.* (Count III), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state law claims (Counts I, II, IV, V, VI, VII).

16.    This Court, located within the County of Los Angeles, is the proper venue and has personal jurisdiction over Defendants because the parties contractually agreed that "[i]n the event of any dispute arising out of or relates to [the Business Services Agreement] or the account of the Parties…with exclusive jurisdiction and venue properly held in the County of Los Angeles." Business Services Agreement, Miscellaneous, page 4 of 5.

17.    The parties agreed that legal disputes "shall be resolved under the laws of California." *Id.*

### IV.    FACTS

**A. Electronic Payment Processing Industry**

18.    The electronic payment industry consists of a chain of service providers, each providing unique value to the payment transaction, and each adding cost to a payment card transaction, which work in tandem to facilitate a consumer's purchase of goods or services from a merchant through the use of a credit card or debit card.

19.    The processing of credit and debit card payments involves multiple financial entities working together to facilitate transactions. The key participants in this industry include:

(i)     Cardholders- Consumers who use credit or debit cards to make purchases;

(ii)    Issuing Banks - Financial institution or banks that issue payment cards to consumers and authorize transactions;

(iii)   Merchants - Businesses that accept credit and debit card payments from customers in exchange for goods or services;

(iv)    Acquiring Banks – Financial institutions that are registered with Visa and Mastercard and provide merchant accounts to process transactions on behalf of merchants and provide settlement services;

(v)     Payment Service Providers – Intermediary entities that facilitate transaction processing, ensuring that funds are routed appropriately between merchants and acquiring banks;

(vi)    Card Networks – Payment networks, such as Visa and Mastercard, that regulate and oversee electronic payment transactions.

20.    For a PSP to lawfully process transactions, it must be registered with an acquiring bank and comply with applicable financial regulations.

21.    Further, PSPs are prohibited from directly accessing merchant funds and must follow strict guidelines to ensure that payments are settled appropriately.

**B. Process from an Approved Transaction to Merchant Payment**

22.    When a Cardholder presents a credit or debit card to a Merchant for payment, the transaction details are immediately communicated to the issuing bank that issued the card. The issuing bank reviews the transaction and either approves or declines it based on the status of the customer's account. The card-issuing bank, however, does not necessarily process the payment for the merchant. Instead, financial institutions known as acquiring banks perform this function.

23.    Once the issuing bank approves the transaction, the merchant records the transaction as authorized.    To receive payment, the merchant must transmit the authorized transaction data to an acquiring bank, which is a financial institution that has

direct relationships with credit card associations such as Visa and MasterCard. Acquiring banks facilitate payment processing by ensuring that approved transactions are submitted to the appropriate networks for settlement.

24.    After receiving the transaction data, the acquiring bank forwards it to the relevant card network. The card network, such as Visa or MasterCard, then routes the transaction to the issuing bank. The issuing bank deducts the transaction amount from the cardholder's account and any applicable interchange fees.

25.    Once the acquiring bank receives the funds, it deposits the amount into the merchant's account, deducting any processing fees and other applicable charges. This process ensures that merchants receive the funds from approved transactions in a structured and regulated manner.

26.    To assist with the settlement process, acquiring banks often work with payment service providers. A payment service provider is a third-party entity that facilitates credit and debit card transactions on behalf of merchants. Payment service providers operate under agreements with acquiring banks and offer services such as transaction processing, regulatory compliance, security measures, and the remittance of funds to merchants.

**C. Cristaudo Deceives Emblaze Into Entering a Business Services Agreement**

27.    In mid-July 2024, Frank, on behalf of Cristaudo Holdings LLC, fraudulently induced Emblaze to enter into a Business Services Agreement (the "Agreement") by falsely representing that:

    a.    Cristaudo was a Level-1 PCI compliance PSP capable of securely processing payments;

    b.    Cristaudo was a licensed PSP in multiple African and Latin American countries;

    c.    Cristaudo has established banking relationships that enabled it to serve as a legitimate intermediary for Emblaze's payment services;

    d.    Cristaudo was worth hundreds of millions of dollars and owned multiple

homes in New York, regularly travelling between the Hamptons and New York City;

    e.  Cristaudo's DAPIT technology was used in major stadiums and arenas across the United State, including the Inuit Dome in Inglewood, California, and was preparing for an IPO.

28.  Based on these false assurances, Emblaze entered into the Agreement and entrusted Cristaudo with the processing, settlement, and remittance of merchant transaction funds.

29.  The Agreement was intended to remain in effect for an initial period of one year, with automatic renewal for additional successive years unless either party opted to terminate the contract following the completion of merchant payment services. The Agreement, Term/Termination.

30.  Under the terms of the Agreement, Cristaudo and its principal, Frank, represented that Cristaudo provides "support services on the transaction card processing services of third parties ('Merchant Services')." The Agreement, Preamble.

31.  Based on this representation, Emblaze "wish[ed] to engage and utilize CRISTAUDO for the providing of the Merchant Services…." *Id.*

32.  Specifically, Cristaudo agreed to provide the following services:
a. "[f]acilitate payment processing services;"
b. "[p]rovide to Emblaze on a timely basis copies of relevant rules, regulations, operating manuals, operating letters and policies, and cardholder data security standards for third parties engaged by CRISTAUDO in the provision of Merchant Services";
c. "[m]onitor daily sales activity and collect the net amount of daily chargebacks and any related penalties, fees or reimbursables   costs from each direct product line and sales collections of   EMBLAZE";
d. "[g]uarantee the remittance of all funds due and owing to EMBLAZE to be  paid via bank wire from United States sales and USDT from international    sales,  including  the

7
**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

guarantee of any funds that may be held by the acquiring banks or any other third party engaged by CRISTAUDO as part of the Merchant Services":
The Agreement, Services Provided, Page 1 of 5.

33.     By entering into this agreement, Emblaze relied on Cristaudo representations and entrusted it with the responsibility of handling payment transactions in a legally compliant manner. Instead, Cristaudo violated this trust and its promise that it "shall act in full compliance with all laws and regulations, including but not limited to FDIC regulations and other applicable laws…." *Id.*

34.     Cristaudo did agree to "indemnif[y] Emblaze holding it harmless from all claims arising from the Merchant Services." *Id.*; *See also* the Agreement, Indemnity, Page 3 of 5. Cristaudo also endowed Emblaze with the right "to proceed directly against Cristaudo to recover any amounts due and owing..., without first exhausting any remedies against any third party." The Agreement, Cristaudo Guarantee, page 2 of 5. Further, "this guarantee [was] binding upon CRISTAUDO, including Frank Cristaudo personally, and… their respective…successors and assigns…." *Id.*

35.     Despite these contractual obligations, Cristaudo and Frank had no intention of honoring them. Their true objective was to gain access to Emblaze's merchant funds and siphon them for personal gain.

**D.  Defendants' Fraudulent Scheme and Emblaze's Discovery of the Fraud**

36.     Frank and Veronica orchestrated an elaborate scheme to defraud Emblaze by falsely presenting Cristaudo as a legitimate payment service provider with the banking relationships necessary to lawfully process credit and debit card transactions. In reality, Cristaudo was neither registered with any card network nor sponsored by an acquiring bank, rendering its purported ability to function as a PSP entirely fictitious. Lacking the necessary infrastructure, Frank and Veronica established fraudulent merchant accounts under their control, using them as vehicles to siphon funds away from Emblaze and its merchants.

37.     For the first eight weeks, Cristaudo faithfully maintained the appearance of

legitimacy by processing some transactions and providing timely settlements.    However, in late October 2024, settlement delays began, and by early November, Defendants stopped remitting funds while continuing to funnel transactions into their own accounts. Frank directly stole funds from Emblaze and its merchants and transferring them into an e-wallet controlled by Veronica.

38.    Far from being a passive participant, Veronica played an active role in the fraud. She attended in-person meetings, participated in phone calls, and repeatedly provided false assurances about the stolen funds to prevent Emblaze from taking immediate action.

39.    When Emblaze began raising concerns about the delays, Frank and Veronica engaged in a deliberate pattern of deception, with Frank's responses oscillating between evasion, implausible excuses, and outright fabrications. He would disappear for days at a time, only to return with incoherent justifications for the missing money.

40.    When pressed for details, he blamed supposed bank errors, claiming financial institutions were withholding funds without cause.

41.    At times, Frank fabricated Visa violations and fines, forging documents to make it appear as though Emblaze had incurred financial penalties. When Emblaze investigated, it discovered Frank falsified documents to shift financial responsibility onto Emblaze.

///

///

///

///

///

///

///

///

///

9

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

42.     The following messages demonstrate that Frank edited financial records to justify withholding funds, further deceiving Emblaze and concealing the true nature of his scheme:



**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

43.    As settlement delays continued, merchant clients began demanding immediate payment from Emblaze. When confronted with these issues, Frank's behavior became increasingly erratic. Franks's responses devolved into profanity-laced tirades, even though Emblaze, despite being the victim in this situation, conducted each conversation with him in a professional and measured tone, always acting in good faith and giving Frank many opportunities to correct the wrong. When questioned about missing funds, he not only failed to provide explanations but also resorted to threats of violence. On January 30, 2025, Frank explicitly stated that he had agents prepared to break the legs of individuals he claimed were responsible for withholding payments—further exposing his lack of professionalism, integrity, and credibility.

44.    The full extent of the fraud was uncovered in mid-January 2025 when Frank, accompanied by his banking partners from Africa and Mexico, inadvertently revealed that $67,000 out of approximately $286,000 owed to Emblaze had been diverted to an e-wallet controlled by Frank—an account of which Emblaze had no prior knowledge. This revelation prompted Emblaze to launch an internal investigation, which confirmed that Defendants had systematically stolen over two million dollars in merchant funds. The fraudulent operation had persisted for approximately three to four months, with Defendants exploiting Emblaze's trust to misappropriate funds under the guise of legitimate payment processing.

45.    When Jas met Frank in Miami on Friday, January 17th, 2025, where Frank claimed that he had the funds owed to Emblaze and would wire the entire amount in a lump-sum from his Bank of America ("BOA") account. He stated that the funds had been deposited into his account in Canada and were in the process of being transferred to Jas's BOA account. Jas provided Frank with Emblaze's BOA account information, including direct deposit details. Despite Frank's acknowledgement of the debt and repeated promises to repay, Frank and Veronica never returned the money.

46.    As late as January 30, 2025, during a phone call with Emblaze's principal, Frank again falsely promised to return the stolen funds—yet, unsurprisingly, no payment

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

was ever made. As pressure mounted, they abruptly ceased all communication. Calls and emails went unanswered, and ultimately, Frank and Veronica disappeared — taking the stolen funds with them.

**FIRST CLAIM FOR RELIEF**
**Fraud**
**(Against All Defendants)**

47.    Emblaze incorporates by reference the preceding paragraphs.

48.    "Generally, the elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 845 (2007) (internal quotations omitted).

49.    The Cristaudo Defendants first engaged in a fraudulent scheme by misrepresenting their ability to lawfully process electronic payments. They falsely claimed that Cristaudo had the requisite relationships with acquiring banks and financial institutions to serve as a lawful intermediary in processing transactions. Based on these false representations, Emblaze entered into the Agreement with Cristaudo and its principal, Frank, entrusting them with processing transactions and ensuring compliance with financial regulations.

50.    The Cristaudo Defendants then diverted funds meant for merchants into their own accounts, disguising their fraudulent activity under the pretense of processing transactions. The fraudulent scheme was uncovered when numerous business owners demanded payment for funds they had not received, revealing that Cristaudo had intercepted their money.

51.    As a direct consequence of the Defendants' unlawful conduct, Emblaze has suffered financial losses exceeding two million dollars, along with substantial reputational harm.

52.    Therefore, Emblaze seeks relief for damages incurred as a direct result of

12

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

this unlawful conduct, and other damages, remedies, and relief allowed under applicable law.

### SECOND CLAIM FOR RELIEF
### Conspiracy to Defraud
### (Against All Defendants)

53.    Emblaze incorporates by reference the preceding paragraphs.

54.    "[A] plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortg. Co.,* 24 Cal. 3d 773, 785 (1979). "[T]he requisite concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Id*. "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator." *Id*.

55.    The Cristaudo Defendants conspired to defraud Emblaze by devising a plan to gain its trust and access to its funds by way of misrepresenting Cristaudo's ability to legitimately process payments.

56.    They falsely marketed Cristaudo as a legitimate payment service provider, despite lacking the necessary banking relationships and registration with any card network.

57.    They initially fulfilled some payment obligations to maintain the illusion of legitimacy, encouraging Emblaze to route additional transactions through Cristaudo.

58.    Eventually, Defendants ceased processing payments and ignored inquiries from Emblaze and the merchants demanding the missing funds, ultimately disappearing with the misappropriated funds.

59.    The conspiracy to defraud has caused Emblaze significant financial and reputational harm, with over two million dollars in merchant funds stolen and remaining unpaid.

60.    Therefore, Emblaze seeks relief for damages incurred as a direct result of this unlawful conduct, and other damages, remedies, and relief allowed under applicable law.

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

### THIRD CLAIM FOR RELIEF
### Violation of the Racketeer Influenced and Corrupt Organizations Act
### ("RICO") 18 U.S.C. §§1961, *et seq.*)
### (Against All Defendants)

61.    Emblaze incorporates by reference the preceding paragraphs.

62.    The elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

63.    On information and belief, Defendants formed an association-in-fact enterprise where Defendants created a framework to carry out their common purpose of defrauding Emblaze and its merchants.

64.    Specifically, upon information and belief, the enterprise involved Frank and Veronica marketing Cristaudo as a legitimate PSP, falsely claiming it had the ability to process payments for businesses. Through this misrepresentation, Defendants induced Emblaze to enter into an agreement, believing Cristaudo would lawfully facilitate payment processing. Instead of merely acting as an intermediary, Cristaudo opened merchant accounts in its own name or in the names of controlled entities with acquiring banks. With access to Emblaze's merchant services system, Cristaudo routed legitimate merchant transactions into these fraudulent merchant accounts instead of allowing them to flow to the rightful merchants. This allowed Cristaudo to receive and control funds from unsuspecting Emblaze. The funds were then withdrawn, laundered, or misappropriated before detection. Because Cristaudo had opened merchant accounts under false pretenses, acquiring banks unknowingly processed payments that were actually being funneled to Cristaudo's accounts instead of to the legitimate merchants.

65.    On information and belief, Defendants perpetrated their activities in furtherance of the conspiracy as a single unit. Each Defendant's coordinated activities were necessary to successfully complete the fraudulent scheme and to steal money from Emblaze and its merchants.

66.    Defendants and Defendants' enterprise engaged in racketeering activity in the form of wire fraud in violation of 18 U.S.C. §1343 by: a) forming a scheme to defraud, b) using the wires in furtherance of that scheme, and c) with the specific intent to defraud. Specifically, Defendants made false misrepresentations by electronic communications to Emblaze and its merchants, namely that Cristaudo would provide credit/debit card processing services and remit settled funds to Emblaze and other its merchants.

67.    As a result of this conduct by Defendants, Emblaze's merchants were deprived of their rightful funds. Emblaze, which thought it had provided a secure platform for these merchants, became liable for the losses.

68.    Defendants and Defendants' enterprise engaged in racketeering activity in the form of financial institution fraud in violation of 18 U.S.C. §1344 by obtaining money under the custody or control of a financial institution by means of false representations. Specifically, Defendants submitted credit/debit card transactions to acquiring banks while falsely representing that the transactions were those of Defendants rather than those of Emblaze and its merchants, and that Defendants were entitled to the settled funds.

69.    Defendants and Defendants' enterprise engaged in racketeering activity in the form of operating an unlicensed money transmission business in violation of 18 U.S.C. §1960. Specifically, Defendants were involved in the transportation and transmission of funds that they knew had been derived from a criminal offense.

70.    Defendants engaged in at least two predicate acts in support of the enterprise activity after they fraudulently induced Emblaze into entering into the Agreement with the intent to steal their money. Specifically, they: (1) submitted or caused to be submitted Emblaze's and its merchants' transaction data to acquiring banks on at least two occasions in their own names rather than Plaintiff's name, b) when they received Emblaze's and its merchants' settled funds from acquiring banks.

71.    On information and belief, in engaging in this activity, each Defendant

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

knowingly implemented the decisions to defraud and to steal from Emblaze and its merchants, and each Defendant was indispensable to the achievement of the enterprise's goal.

72.    Defendants' enterprise lasted from Augus of 2024 through January of 2025.

73.    As a result of Defendants' racketeering activity, Emblaze suffered an injury to its business and property. Therefore, Emblaze seeks relief for damages incurred as a direct result of this unlawful conduct, and other damages, remedies, and relief allowed under applicable law.

**FOURTH CLAIM FOR RELIEF**
**Conversion**
**(Against all Defendants)**

74.    Emblaze incorporates by reference the preceding paragraphs.

75.    "The essential elements of conversion are: (1) the plaintiff owned or had the right to possess the personal property; (2) the defendant disposed of the property in a manner inconsistent with the plaintiff's property rights; and (3) resulting damages." *Berry v. Frazier*, 90 Cal. App. 5th 1258, 1271 (2023).

76.    The Cristaudo Defendants wrongfully possessed and exercised control over funds that were intended for merchants using Emblaze's platform for which Emblaze had the right to possess on behalf of those merchants.  The total value of the funds is at least $3 million.

77.    They systematically siphoned merchant funds into personal accounts, thereby depriving Emblaze of the funds owed to it on behalf of its merchants.

78.    Despite contractual obligations to remit funds to Emblaze, the Cristaudo Defendants failed to do so, instead using the funds for their personal gain.

79.    The conversion of funds has resulted in Emblaze bearing the financial burden of over two million dollars in unpaid merchant funds.

80.    Therefore, Emblaze seeks relief for damages incurred as a direct result of this conduct, and other damages, remedies, and relief allowed under applicable law.

///

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting
### (Against Veronica)

81.    Emblaze incorporates by reference the preceding paragraphs.

82.    "Liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2005).

83.    Veronica knowingly and substantially assisted Frank in carrying out his fraudulent scheme to misappropriate funds from Emblaze and its merchants.

84.    Veronica's assistance was essential to the success of Defendants' fraudulent enterprise. By engaging in misrepresentations, assisting in the diversion of funds, she played an indispensable role in perpetuating the fraud.

85.    As a direct and proximate result of her assistance, Emblaze was defrauded suffering financial losses exceeding two million dollars, reputational harm, and significant business disruption.

86.    Therefore, Emblaze seeks relief for damages incurred as a direct result of Veronica's aiding and abetting, and other damages, remedies, and relief allowed under applicable law.

### SIXTH CLAIM FOR RELIEF
### Breach of Contract
### (Against Frank and Cristaudo)

87.    Emblaze incorporates by reference the preceding paragraphs.

88.    In or around July of 2024, Emblaze entered into a Business Services Contract with Frank and Cristaudo.

89.    For the first eight weeks of the relationship, Cristaudo faithfully maintained the appearance of legitimacy by processing some transactions and providing timely settlements, just as set forth in the agreement.  However, in late October 2024, settlement

17

delays began, and by early November, Defendants stopped remitting funds while continuing to funnel transactions into their own accounts.

90. Under the contract, Frank and Cristaudo agreed to process credit/debit transactions for Emblaze and its clients.

91. Emblaze performed under the Contract.

92. Frank and Cristaudo breached the Contract when it did not send settlement funds to Emblaze and its merchants.

93. As a result of their breaches, Emblaze has been damaged.

94. Therefore, Emblaze seeks relief for damages incurred as a direct result of this breach, and other damages, remedies, and relief allowed under applicable law.

## SEVENTH CLAIM FOR RELIEF
### Equitable Restitution
### (All Defendants)

95. Emblaze incorporates by reference the preceding paragraphs.

96. "There is no cause of action in California labeled unjust enrichment. Rather, an unjust enrichment claim is grounded in equitable principles of restitution." *Sepanossian v. Nat'l Ready Mix Co., Inc.,* 97 Cal. App. 5th 192, 206 (2023) (internal quotations omitted).

97. "Under the law of restitution, [a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another. A person is enriched if the person receives a benefit at another's expense…The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Durell v. Sharp Healthcare,* 183 Cal. App. 4th 1350, 1370 (2010) (internal quotations omitted).

98. As previously stated, Defendants engaged in wrongful conduct against Emblaze. As the result of this conduct, Defendant unjustly enriched themselves at Emblaze's expense. Given the circumstances --- where Defendants used unlawful means to induce Emblaze into the relationship --- it would be unjust for Defendants to retain the benefits. Emblaze is entitled to a constructive trust and restitution of all amounts

18

wrongfully taken and/or retained by Defendants at Emblaze's expense.

99.    Therefore, Emblaze seeks restitution as allowed under applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff EMBLAZE ONE INC. prays for judgment against Frank A. Cristaudo, Veronica S. Baitova, Cristaudo Holdings LLC, DapIt NA LLC, Maxafi Holdings LLC, Veronica Web Project Inc. as follows:

A.    That judgment be entered in its favor, and against the Defendants, and each of them;

B.    For restitution and/or disgorgement of all sums unlawfully obtained and/or retained by Defendants;

C.    For compensatory damages and general damages according to proof;

D.    For punitive damages;

E.    For treble damages pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d);

F.    For reasonable attorney's fees;

G.    For prejudgment interest;

H.    For costs of suit; and

I.    For such other relief as the Court deemed just and proper.

///
///
///
///
///
///
///
///
///
///

19

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

# JURY TRIAL DEMAND

Plaintiff EMBLAZE ONE INC. demands a jury trial on all claims for relief so triable.

Dated: March 3, 2025

GRIFFIN PARTNERS LLP
HEATH STEINBECK, LLP

_/s/ Steven A. Heath_
OLIVER D. GRIFFIN
oliver.griffin@griffinlawllp.com
MELISSA A. BOZEMAN
melissa.bozeman@griffinlawllp.com

STEVEN A. HEATH
saheath@heathsteinbeck.com
Attorneys for Plaintiff EMBLAZE ONE INC.

20

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**